IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**FILED**

**OCT 2 6 2010**

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

| | |
|---|---|
| THE CITY OF SANDY SPRINGS, a political subdivision of the State of Georgia, <br><br> Plaintiff, <br><br> v. <br><br> ERIC H. HOLDER JR, Attorney General of the United States of America, <br><br> THOMAS E. PEREZ, Assistant Attorney General, <br><br> Defendants. | Civil Action No. 1:10-cv-01502 <br> (Three-Judge Court) |

## CONSENT JUDGMENT AND DECREE

1. This action was initiated on September 7, 2010 by Plaintiff City of Sandy Springs, Georgia ("the City") against Defendants the Attorney General of the United States and the Assistant Attorney General for Civil Rights (collectively "the Attorney General"). The City is a governmental entity organized under the constitution and laws of the State of Georgia.

2. The State of Georgia became covered as a whole by certain special provisions of the Voting Rights Act, based on a coverage determination under the first sentence of Section 4(b), made by the Attorney General and the Director of the Census, and published in the Federal Register on August 7, 1965. *See* 30 Fed. Reg. 9897. By virtue of this coverage determination, the State of Georgia and all of its political subunits (including the City) must receive preclearance under Section 5 of the Voting Rights Act for all changes affecting voting enacted or implemented after November 1, 1964.

3.  In this action, the City seeks a declaratory judgment pursuant to the second sentence of the "bailout" provisions of Section 4(a)(1) of the Voting Rights Act, 42 U.S.C. § 1973b(a)(1), declaring it exempt from the preclearance provisions of Section 5 of the Act, 42 U.S.C. § 1973c.

4.  This three-judge Court has been convened as provided in 42 U.S.C. § 1973b(a)(5) and 28 U.S.C. § 2284 and has jurisdiction over this matter.

5.  Section 4(a) of the Voting Rights Act provides that a state or political subdivision subject to the special provisions of the Act may be exempted or "bailed out" from those provisions, through an action for a declaratory judgment before this Court, if it can demonstrate fulfillment of the specific statutory conditions in Section 4(a), for the time period "during the ten years preceding the filing of the action" and "during the pendency of such action," as described below:

> no such test or device has been used within such State or political subdivision for the purpose or with the effect of denying or abridging the right to vote on account of race or color or (in the case of a State or subdivision seeking a declaratory judgment under the second sentence of this subsection) in contravention of the guarantees of subsection (f)(2) of this section (42 U.S.C. § 1973b(a)(1)(A));

> no final judgment of any court of the United States, other than the denial of declaratory judgment under this section, has determined that denials or abridgements of the right to vote on account of race or color have occurred anywhere in the territory of such State or political subdivision or (in the case of a State or subdivision seeking a declaratory judgment under the second sentence of this subsection) that denials or abridgements of the right to vote in contravention of the guarantees of subsection (f)(2) of this section have occurred anywhere in the territory of such State or subdivision and no consent decree, settlement, or agreement has

been entered into resulting in any abandonment of a voting practice challenged on such grounds; and no declaratory judgment under this section shall be entered during the pendency of an action commenced before the filing of an action under this section and alleging such denials or abridgements of the right to vote (42 U.S.C. § 1973b(a)(1)(B));

no Federal examiners or observers under subchapters I-A to I-C of this chapter have been assigned to such State or political subdivision (42 U.S.C. § 1973b(a)(1)(C));

such State or political subdivision and all governmental units within its territory have complied with section 1973c of this title, including compliance with the requirement that no change covered by section 1973c of this title has been enforced without preclearance under section 1973c of this title, and have repealed all changes covered by section 1973c of this title to which the Attorney General has successfully objected or as to which the United States City Court for the City of Columbia has denied a declaratory judgment (42 U.S.C. § 1973b(a)(1)(D));

the Attorney General has not interposed any objection (that has not been overturned by a final judgment of a court) and no declaratory judgment has been denied under section 1973c of this title, with respect to any submission by or on behalf of the plaintiff or any governmental unit within its territory under section 1973c of this title, and no such submissions or declaratory judgment actions are pending (42 U.S.C. § 1973b(a)(1)(E)); and

such State or political subdivision and all governmental units within its territory - (i) have eliminated voting procedures and methods of election which inhibit or dilute equal access to the electoral process; (ii) have engaged in constructive efforts to eliminate intimidation and harassment of persons exercising rights protected under subchapters I-A to I-C of this chapter; and (iii) have engaged in other constructive efforts, such as expanded opportunity for convenient registration and voting for every person of voting age and the appointment of minority persons as election officials throughout the jurisdiction and at all stages of the election and registration process (42 U.S.C. § 1973b(a)(1)(F)(i-iii)).

6.   Section 4(a) provides the following additional requirements to obtain bailout:

3

> To assist the court in determining whether to issue a declaratory judgment under this subsection, the plaintiff shall present evidence of minority participation, including evidence of the levels of minority group registration and voting, changes in such levels over time, and disparities between minority-group and non-minority-group participation. (42 U.S.C. § 1973b(a)(2));
>
> No declaratory judgment shall issue under this subsection with respect to such State or political subdivision if such plaintiff and governmental units within its territory have, during the period beginning ten years before the date the judgment is issued, engaged in violations of any provision of the Constitution or laws of the United States or any State or political subdivision with respect to discrimination in voting on account of race or color or (in the case of a State or subdivision seeking a declaratory judgment under the second sentence of this subsection) in contravention of the guarantees of subsection (f)(2) of this section unless the plaintiff establishes that any such violations were trivial, were promptly corrected, and were not repeated. (42 U.S.C. § 1973b(a)(3));
>
> The State or political subdivision bringing such action shall publicize the intended commencement and any proposed settlement of such action in the media serving such State or political subdivision and in appropriate United States post offices . . . . (42 U.S.C. § 1973b(a)(4)).

7. Section 4(a)(9) provides that the Attorney General can consent to entry of a declaratory judgment granting bailout "if based upon a showing of objective and compelling evidence by the plaintiff, and upon investigation, he is satisfied that the State or political subdivision has complied with the requirements of [Section 4(a)(1)] . . . ." 42 U.S.C. § 1973b(a)(9).

8. The City contacted the Attorney General prior to filing this action and advised of its interest in seeking bailout. The Attorney General has conducted a thorough investigation of the City's eligibility to seek bailout and agrees that the City has fulfilled all conditions required

by Section 4(a) and is entitled to the requested declaratory judgment, as set forth herein. The parties have filed a Joint Motion for Entry of this Consent Judgment and Decree.

## AGREED STIPULATION OF FACTUAL FINDINGS

9. The City is a political subdivision of the State of Georgia and is thus a political subdivision of a state within the meaning of Section 4(a)(1) of the Voting Rights Act. *See* 42 U.S.C. § 1973b(a)(1); *see also Nw. Austin Mun. Util. Dist. No. One v. Holder*, 129 S. Ct. 2504, 557 U.S. ___ (2009).

10. The City is located entirely within the boundaries of Fulton County, Georgia ("Fulton County" or "the County"). The City was established under the provisions of Georgia House Bill No. 37 (2005).

11. The City does not contain any subjurisdictions or governmental units for which it is responsible.

12. The 2000 Census indicates that Fulton County had a total population of 816,006 persons, and the racial makeup of the County's population was 369,997 (45.34%) Non-Hispanic white, 361,018 (44.24%) Non-Hispanic black, 48,056 (5.89%) Hispanic, and 24,635 (3.02%) Asian. The total voting age population ("VAP") of Fulton County in 2000 was 616,716, and the racial makeup of the VAP was 297,707 (48.27%) Non-Hispanic white, 256,020 (41.51%) Non-Hispanic black, 35,704 (5.79%) Hispanic, and 18,859 (3.06%) Asian. The total estimated citizen voting age population ("CVAP") of Fulton County in 2000 was 567,773, and the racial makeup of the citizen voting age population was 287,994 (50.72%) Non-Hispanic white, 250,379 (44.10%) Non-Hispanic black, 12,535 (2.21%) Hispanic, and 8,942 (1.57%) Asian.

13. The 2006-2008 American Community Survey ("ACS") Census data estimates that the total population of Fulton County increased to 990,562 persons. These estimates put the racial make-up of the County at 437,611 (44.18%) Non-Hispanic white, 421,015 (42.50%) Non-Hispanic black, 79,652 (8.04%) Hispanic, and 41,366 (4.18%) Asian. Estimates using the ACS data place the VAP in the County at 743,238. Of the VAP, the estimated racial make-up is 347,234 (46.72%) Non-Hispanic white, 305,583 (41.12%) Non-Hispanic black, 52,514 (7.07%) Hispanic, and 31,219 (4.20%) Asian. Estimates using the ACS data place the CVAP of the County at 668,649. Of this population, the estimated racial make-up is 332,662 (49.75%) Non-Hispanic white, 298,167 (44.59%) Non-Hispanic black, 18,128 (2.71%) Hispanic, and 14,396 (2.15%) Asian.

14. As of September 1, 2010, Fulton County had 514,586 registered voters, of whom 228,778 were white (44.46%), 209,683 were black (40.75%), 5,150 were Hispanic (1.00%), 8,174 were Asian (1.59%), and 62,801 (12.20%) were classified as "other."

15. Sandy Springs was a Census Designated Place (CDP) for the 2000 Census, even though it was not incorporated as a City until 2005. The boundaries of the presently incorporated City of Sandy Springs match those of the 2000 CDP. According to the 2000 Census, the total population of the area of Fulton County known as Sandy Springs was 85,781, of which 62,657 (73.04%) were Non-Hispanic white, 10,139 (11.82%) were Non-Hispanic black, 8,514 (9.93%) were Hispanic and 2,820 (3.29%) were Asian. The area's VAP was 70,518 persons, and the racial makeup of the VAP in 2000 was 52,626 (74.63%) Non-Hispanic white, 7,907 (11.21%) Non-Hispanic black, 6,665 (9.45%) Hispanic, and 2,378 (3.37%) Asian. The estimated CVAP was 60,250 in 2000, and the estimated racial makeup of the CVAP in 2000 was

49,765 (82.60%) Non-Hispanic white, 7,118 (11.81%) Non-Hispanic black, 1,596 (2.65%) Hispanic and 790 (1.31%) Asian.

16. The 2006-2008 ACS estimates the total population of the City of Sandy Springs at 98,941. The estimated racial make-up of the City is 66,500 (67.21%) Non-Hispanic white, 14,654 (14.81%) Non-Hispanic black, 12,342 (12.47%) Hispanic and 4,030 (4.07%) Asian. The estimated VAP is 79,128. The VAP is estimated to be 54,871 (69.34%) Non-Hispanic white, 11,167 (14.11%) Non-Hispanic black, 8,533 (10.78%) Hispanic, and 3,298 (4.17%) Asian. The ACS estimates total CVAP in the City at 64,900, which is estimated to be 51,232 (78.94%) Non-Hispanic white, 9,612 (14.81%) Non-Hispanic black, 1,993 (3.07%) Hispanic, and 1,484 (2.29%) Asian.

17. As of September 1, 2010, Sandy Springs had 50,771 registered voters, of whom 35,407 were white (69.74%), 8,087 were black (15.92%), 662 were Hispanic (1.30%), 636 were Asian (1.25%), and 5,888 (11.77%) were classified as "other.".

18. H. B. No. 37 called for a referendum to be held regarding the creation of the City of Sandy Springs from an unincorporated portion of Fulton County. The measure was submitted to those voters who would be included in the City on June 21, 2005 and was approved.

19. H.B. No. 37 also contained the text of the Sandy Springs City Charter, which provides for six City Council members (elected from single-member districts) and a Mayor (elected at-large), all of whom are concurrently elected to four-year terms every fourth odd-numbered year from 2005 onwards. City elections are nonpartisan and subject to a majority vote requirement.

20. Initial elections for City Council and Mayor were held on November 8, 2005. Due to the majority vote requirement, a runoff election was held for two City Council seats on December 6, 2005. Subsequently, the City also had a special election to fill a City Council vacancy on November 6, 2007 as well as an election for all of the City Council seats and the Mayor on November 3, 2009. The November 2009 election was the City's most recent municipal election, with contested elections for three of the six City Council districts and the Mayor. No runoff elections were necessary.

21. Minorities have not been elected to municipal office in the City.

22. African-American candidates have been elected to the Fulton County Board of Commissioners, and five of the seven current Fulton County Commissioners, including both at-large Commissioners, are African-American.

23. Voter registration is not conducted under the supervision of the City. Pursuant to state law, processing and determinations regarding voter registration applications are made by Fulton County and voter registration information is entered by the County into the statewide voter registration database maintained by the Georgia Secretary of State. Voter registration is unitary in the State of Georgia, in that registering to vote once will register voters for all elections, federal, state, county and municipal.

24. The overall voter registration rate in the City exceeds the overall voter registration rate in the County, and voter registration rates in the City outpace those in the County for every major racial or ethnic group except Asians.

25. Voter turnout varies depending upon the type of election. In the November 2008 federal general election in Fulton County, the overall voter turnout was 72.8%, and included

74.3% of white voters and 71.3% of black voters. In the November 2006 federal general election in Fulton County, the overall voter turnout was 45.6%, including 52.4% of white voters and 41.5% of black voters. In the November 2009 City elections, the overall voter turnout was 16.1%, and included 20.8% of white voters, and 4.4% of black voters. In the November 2005 City election, overall voter turnout was 26.5%, and included 31.6% of white voters and 8.0% of black voters.

26.    As is true generally of municipalities in Georgia, elections for city offices in Sandy Springs are conducted on a different schedule from elections for county, state or federal offices. All elections in the territory of the City, including federal, State, county and municipal elections, are administered by the Fulton County Department of Registration and Elections which performs all election-related functions, including voter registration, selection and management of polling places, appointment and training of poll workers, and preparation and tabulation of the ballots. Likewise, all voter registration and election activities in the Sandy Springs area prior to incorporation of the City were conducted by Fulton County.

27.    Over the course of its history, two submissions have been filed on the City's behalf under Section 5 of the Voting Rights Act, both of which occurred in 2005: the first involved incorporation of the City and approval of its method of election and the second involved changes to precinct boundaries to match the newly created City's municipal boundaries. Other than that one change, the precinct boundaries and polling places in the Sandy Spring area have remained constant for the last ten years. The Attorney General has not interposed an objection to any of these submissions. Fulton County, which has administered all elections in the geographic area that encompasses the City, both before and after the City's incorporation, has

made more than 500 submissions. The Attorney General has not interposed an objection to any of these submissions.

28.     The City publicized the intended commencement of this action in the manner required by Section 4(a)(4) prior to its being filed by placing advertisements in local newspapers and by conducting a public hearing on the matter. The City is publicizing notice of this proposed settlement simultaneously with the filing of the Joint Motion for Entry of Consent Judgment and Decree, as required by Section 4(a)(4). The parties request that this Court wait 30 days after filing of the Joint Motion for Entry of this Consent Judgment and Decree, before approving this settlement, while this notice of proposed settlement is advertised.

29.     The parties agree that allowing bailout by the City is appropriate notwithstanding the fact that it was incorporated in 2005, less than ten years ago. This consent is premised on an understanding that Congress intended Section 4(a) as a remedy that is to be linked to the most recent ten-year history of a particular territorial area. For the past ten years, Fulton County has administered voter registration and elections in the geographic area that encompasses the City, both before and after the City's incorporation, and there is no evidence of discrimination in voting on account of race or color during this period. The Attorney General has previously consented to bailout, and this Court has granted bailout, to nine school districts in Virginia that had conducted elections for less than ten years.

30.     The Attorney General has determined that it is appropriate to consent to a declaratory judgment allowing bailout by the City, pursuant to Section 4(a)(9) of the Voting Rights Act. The Attorney General's consent in this action is based upon his own independent factual investigation of the City's fulfillment of all of the bailout criteria, as well as consideration

of all of the circumstances of this case, including the views of minority citizens in the City, the absence of racial discrimination in electoral processes within the City, and the City's agreement to pursue the measures detailed in Paragraphs 44-51 if it chooses to administer its own elections in the future.

## AGREED FINDINGS ON STATUTORY BAILOUT CRITERIA

31. The City is a covered jurisdiction subject to the special provisions of the Voting Rights Act, including Section 5 of the Act, 42 U.S.C. § 1973c. Under Section 5 of the Act, the City is required to obtain preclearance from either this Court or from the Attorney General for any change in voting standards, practices, and procedures adopted or implemented since the Act's coverage date for the State of Georgia.

32. The only entity seeking bailout through this action is the City. Neither Fulton County nor any political subdivisions in the County other than the City are seeking bailout. The City is a political subdivision entitled to seek bailout from this Court for itself and by itself under Section 4(a). *See Nw. Austin*, 129 S. Ct. at 2516 ("We therefore hold that all political subdivisions . . . are eligible to file a bailout suit"). The City falls within the boundaries of Fulton County and there are no other governmental units within the City's territory for which it is responsible or that must request bailout at the same time as the City, within the meaning of Section 4(a). 42 U.S.C. § 1973b(a).

33. During the ten years preceding the filing of this action and during the pendency of this action there has been no test or device (as defined in Sections 4(c) of the Voting Rights Act) used within the City or within the Sandy Springs area of Fulton County for the purpose or with

the effect of denying or abridging the right to vote on account of race or color. 42 U.S.C. § 1973b(a)(1)(A).

34.     During the ten years preceding the filing of this action, and during the pendency of this action, no final judgment of any court of the United States has determined that denials or abridgements of the right to vote on account of race or color have occurred anywhere in the territory of the City or the Sandy Springs area of Fulton County.  Further, no consent decree, settlement, or agreement has been entered into resulting in any abandonment of a voting practice challenged on such grounds.  No action was filed prior to this action alleging such denials or abridgements of the right to vote. 42 U.S.C. § 1973b(a)(1)(B).

35.     During the ten years preceding the filing of this action, and during the pendency of this action, no Federal examiners or observers have been assigned to the City or Fulton County. 42 U.S.C. § 1973b(a)(1)(C).

36.     During the ten years preceding the filing of this action, and during the pendency of this action, there has been no need for the City or Fulton County to repeal any voting changes to which the Attorney General has objected, or to which this Court has denied a declaratory judgment, since no such objection or denials have occurred.  During this time period, with respect to the conduct of elections in the Sandy Springs area, the City and Fulton County have compiled with Section 5, including compliance with the requirement that no change covered by Section 5 has been enforced without preclearance. 42 U.S.C. § 1973b(a)(1)(D).

37.     The Attorney General has never interposed any objection to voting changes submitted by or on behalf of the City or the Sandy Springs area of Fulton County for administrative review under Section 5.  No such administrative submissions by or on behalf of

12

the City are presently pending before the Attorney General. Neither the City nor Fulton County have ever sought judicial preclearance from this Court under Section 5. Thus, this Court has never denied the City or Fulton County a declaratory judgment under Section 5, nor are any such declaratory judgment actions now pending. 42 U.S.C. § 1973b(a)(1)(E).

38. During the ten years preceding the filing of this action, and during the pendency of this action, neither the City nor Fulton County have employed voting procedures or methods of election in the Sandy Springs area which inhibit or dilute equal access to the electoral process. 42 U.S.C. § 1973b(a)(1)(F)(i).

39. During the ten years preceding the filing of this action, and during the pendency of this action, there have been no known incidents of any individual exercising their right to vote being subject to intimidation in the City or the Sandy Spring area in Fulton County's elections. During the ten years preceding the filing of this action, and during the pendency of this action, there have been constructive efforts to eliminate intimidation and harassment of persons exercising rights protected under the Voting Rights Act. This has included Fulton County's extensive program for the conduct and coordination of election activities within the County, including within the territory of the City, and prior to the City's incorporation, within the Sandy Springs area. 42 U.S.C. § 1973b(a)(1)(F)(ii).

40. During the ten years preceding the filing of this action, and during the pendency of this action, there have been other constructive efforts to expand the opportunity for registration and voting for every person of voting age. Voters in municipal elections in the City, and voters in all other federal, state and county elections conducted in the Sandy Springs area of Fulton County, vote in centrally-located polling places managed by the Fulton County Elections

Department, are allowed to participate in early voting, and benefit from the County's efforts to recruit a diverse pool of poll officials. The poll books for municipal elections in the City, and in all other elections in the Sandy Springs area of Fulton County, utilize voter registration lists provided by the County. There are various opportunities for convenient voter registration in Fulton County, which have increased significantly over time. Fulton County has undertaken efforts to ensure the appointment of minority persons as election officials throughout the jurisdiction and at all stages of the election and registration process. 42 U.S.C. § 1973b(a)(1)(F)(iii).

41. The parties have presented evidence of minority participation, including evidence of the levels of minority group registration and voting, changes in such levels over time, and disparities between minority-group and non-minority-group participation. 42 U.S.C. § 1973b(a)(2).

42. There are no indications that the City or Fulton County have engaged in violations in the Sandy Springs area of any provision of the Constitution or laws of the United States or any State or political subdivision with respect to discrimination in voting on account of race or color during the preceding ten years. 42 U.S.C. § 1973b(a)(3).

43. The City publicized its intended commencement of this action in the manner required by Section 4(a)(4) of the Act, prior to its being filed, by placing advertisements in local newspapers and by conducting a public hearing on the matter. The City is publicizing a notice of the proposed settlement of this action, simultaneously with the filing of the Joint Motion for Entry of Consent Judgment and Decree, as required by Section 4(a)(4). 42 U.S.C. § 1973b(a)(4).

44. The City has expressed a desire to conduct its own elections in the future, as permitted by Georgia law, rather than having such elections run by Fulton County. *See* GA. Code § 21-2-70.1(a). If it assumes administration of its elections, the City would have the authority to appoint registrars, select polling places, appoint poll workers, determine the number of precincts and precinct boundaries, print ballots, operate polling places and tabulate the votes for municipal elections. The Fulton County Elections Department would continue to administer all other elections. The City indicated that it has received polling place and poll worker information from the County and the City Clerk, who will serve as the City's Elections Superintendent, has observed the County's poll worker training procedures.

45. In light of the City's desire to administer its own elections, the City has agreed to undertake certain constructive measures to ensure compliance with the Voting Rights Act as outlined below. Similar measures have been employed by agreement in previous consent decrees in bailout actions in this Court.

46. Prior to any determination by the City to administer its own elections, the City shall advise the public of its intention to assume election-related responsibilities through local media, on its website and through any other means likely to convey this information to City residents, including minority community members.

47. In the event the City decides to administer its own municipal elections, it will form a citizens' advisory group ("the advisory group") that is representative of the City's diversity and that will include at least one member drawn from each racial/ethnic group that comprises at least ten percent of the City's total population under the most recently available ACS data or 2010 Census data. The advisory group shall advise the City as it transitions to

15

running its own elections. The City will inform the public of the opportunity to serve on this advisory group by advertising in local media, on its website and through means such as contacting leaders of various community organizations. Meetings of the advisory group will be open to the public and minutes shall be posted on the City's website.

48. The City will solicit comments from the advisory group regarding planned municipal election procedures, including the selection of poll workers, changes in the number or location of City polling places, and other changes in voting procedures. The City will coordinate with the advisory group on constructive efforts such as recruiting of a diverse group of poll officials, steps leading to greater voter turnout, and ensuring the effectiveness of the City's election program.

49. At least 14 days prior to the beginning of any municipal election administered by the City, the City will mail a sample ballot and information regarding election day polling places to each registered voter.

50. Prior to any reapportionment of City Council districts, the City will take affirmative steps to ensure that City residents, including minority community members, are informed about the proposed reapportionment.

51. During the ten-year period during in which this Court retains retain jurisdiction of this matter pursuant to Section 4(a)(5), 42 U.S.C. § 1973b(a)(5), the City will send a report to the United States within 90 days after any municipal election administered by the City that includes:

    a.    The total number of persons by race who served as election officials in the election;

    b.    Any voting changes undertaken since the last municipal election;

    c. A description of any election-related problems and complaints and the steps undertaken, if any, to address such problems and complaints.

The Report shall be sent by FedEx or other express delivery, to the following address:

> Voting Section
> United States Department of Justice
> Civil Rights Division
> 1800 G. Street, N.W., Room 7254-NWB
> Washington, D.C. 20006

Accordingly, it is hereby ORDERED, ADJUDGED and DECREED:

 I. The Plaintiff, City of Sandy Springs, Georgia, is entitled to a declaratory judgment in accordance with the first sentence of Section 4(a) of the Voting Rights Act, 42 U.S.C. § 1973b(a).

 II. The parties' Joint Motion for Entry of Consent Judgment and Decree is GRANTED, and the Plaintiff City of Sandy Springs, Georgia is exempted from coverage pursuant to Section 4(b) of the Voting Rights Act, 42 U.S.C. § 1973b(b), provided that Sandy Springs be subject to the administration and reports requirements of Paragraphs 44-51 and provided that this Court shall retain jurisdiction over this matter for a period of ten years pursuant to Section 4(a)(5), 42 U.S.C. § 1973b(a)(5). This action shall be closed and placed on this Court's inactive docket, subject to being reactivated upon application by either the Attorney General or any aggrieved person in accordance with the procedures set forth in Section 4(a)(5), 42 U.S.C. § 1973b(a)(5).

 III. Each party shall bear its own costs.

Entered this 26 day of October, 2010.

_____
UNITED STATES CIRCUIT JUDGE

_____
UNITED STATES DISTRICT JUDGE

_____
UNITED STATES DISTRICT JUDGE

Approved as to form and content:

| For Plaintiff, City of Sandy Springs, Georgia: | For the Defendant, ERIC H. HOLDER, JR.: |
|---|---|
| | THOMAS E. PEREZ<br>Assistant Attorney General<br>Civil Rights Division |
| | RONALD C. MACHEN JR.<br>United States Attorney<br>District of Columbia |
| **/s/ Jason Torchinsky** | **/s/ Ali Ijaz Ahmad** |
| JASON TORCHINSKY<br>Holtzman Vogel PLLC<br>45 North Hill Drive, Suite 100<br>Warrenton, VA 20186<br>Phone: (540) 341-8808<br>DC Bar No. 976033<br>jtorchinsky@holtzmanlaw.net | T. CHRISTIAN HERREN, JR.<br>TIMOTHY MELLETT<br>timothy.f.mellett@usdoj.gov<br>DC Bar No. 430968<br>ALI IJAZ AHMAD<br>ali.ahmad@usdoj.gov<br>DC Bar No. 976015<br>Attorneys, Voting Section<br>Civil Rights Division<br>United States Department of Justice<br>Room 7254 - NWB |
| Douglas Chalmers, Jr., Pro Hac Vice<br>FSB FisherBroyles, a Limited Liability Partnership<br>The Pinnacle Building, Fifth Floor | |

| | |
|---|---|
| 3455 Peachtree Road NE<br>Atlanta, GA 30326<br>Phone: (770) 630-5927<br>chalmers@fsblegal.com | 950 Pennsylvania Ave., NW<br>Washington, DC 20530<br>Phone: (202) 305-0015<br>Fax:     (202) 307-3961 |